CITY OF DETROIT *v.* DETROIT UNITED RAILWAY.

1. TRUSTS—EQUITY POWER TO REFORM TRUST.

Equity has power to construe an instrument creating a trust, to reform it so as to carry out the settlor's intention, to instruct the trustee in regard to the execution of the trust, to enforce performance upon all parties concerned, and, under some circumstances, to act in opposition to the provisions of the trust, and, in general, to do whatever is necessary to preserve the trust property and protect the beneficiaries' rights or promote their interests,

2. SAME—STREET RAILWAY BONDS—JURISDICTION OF COURT TO APPORTION BONDS ON SALE OF CITY LINES.

Where the franchise of the Detroit United Railway expired, the city refused to renew same and decided to operate a municipal street railway system, and, after negotiations, purchased the city lines, an exigency, not contemplated by a trust mortgage on all the company's property securing a $25,000,000 bond issue, arose of such nature as to authorize a court of equity to change the terms of the trust by apportioning the bonded indebtedness between the urban lines purchased by the city and the interurban lines retained by the company which alone was unable to carry the entire issue.

3. SAME — EVIDENCE — JUDICIAL NOTICE OF EXIGENCY REQUIRING COURT ACTION.

The Wayne circuit court, by reason of its location, must take judicial notice of the fact that the Detroit United Railway was of necessity obliged to sell its city lines to the city of Detroit and accept therefor $19,850,000 although appraised at around $43,000,000, and that the bondholders were about to lose the security of the city lines and would have to look to the interurban lines alone which could not carry the bond issue of $25,000,000, in determining that an exigency existed requiring the aid of the court in allocating and segregating the bond issue to the respective parties.

4. SAME—EXIGENCY NOT PROVIDED FOR IN TRUST MORTGAGE.

A provision in the trust mortgage allowing the company

to sell materials, rolling stock, real estate, etc., not useful
or necessary in its business, and apply the net proceeds
toward the acquisition of additional real estate, fixtures,
etc., *held,* not to contemplate a sale of its city lines, the
principal property on the security of which the bonds were
issued.

5. SAME—TRUSTEE MAY NOT REPRESENT BONDHOLDERS.

In the absence of an express agreement in a trust mort-
gage securing a bonded indebtedness of a street railway
company, the trustee may not represent the bondholders
in a suit to apportion the bonded indebtedness between
the urban lines purchased by the city and the interurban
lines retained by the company.

6. SAME—JUDGMENT—PARTIES—CLASS SUITS.

Where it would be totally impracticable to bring all the
members of a definite class before the court, but certain
of their class are before it, and the proposed decree is
beneficial, all the members of the class are bound by its
action.

7. SAME—CLASS SUITS—PARTIES SHOULD BE PROPERLY REPRESENTED
BY MEMBERS OF CLASS.

Judgments only bind parties and their privies, and, when
it is sought to bind persons not made parties individu-
ally, that fact and the necessity to bind them should be
made plain so that the court may determine whether
sufficient parties are before it, and take proper care of
the rights of the absent.

8. SAME—BONDHOLDERS PROPERLY REPRESENTED.

The 1,200 bondholders scattered throughout the world,
*held,* represented by a sufficient number to give the court
jurisdiction over the absentees to make a decree binding
upon the interests of all.

Appeal from Wayne; Moynihan (Joseph A.), J.
Submitted January 24, 1924.   (Docket No. 150.)   De-
cided March 5, 1924.

Bill by the city of Detroit against the Detroit United
Railway, the Guaranty Trust Company of New York
and others for the separation and allocation of mort-

gage liens on street railway property purchased by plaintiff from defendant Detroit United Railway. From a decree for plaintiff, defendant Guaranty Trust Company appeals.   Affirmed.

*Richard I. Lawson,* Corporation Counsel, for plaintiff.

*Stevenson, Carpenter, Butzel & Backus* (*Elliott G. Stevenson, William G. Fitzpatrick,* and *Thomas G. Long,* of counsel), for defendant Detroit United Railway.

*Campbell, Bulkley & Ledyard,* and *Stetson, Jennings, Russell & Davis* (*Henry M. Campbell, Allen Wardwell, T. W. Morris, Jr.,* and *C. H. L'Hommedieu,* of counsel), for defendant Guaranty Trust Co. (appellant).

*Orla B. Taylor* and *Henry V. Poor* (*Larkin, Rathbone & Perry,* of counsel), for defendant Central Union Trust Co.

*Corliss, Leete & Moody,* for defendants Cleveland Trust Co. and New York Trust Co.

*Beaumont, Smith & Harris* (*Charles Wright, Jr.,* of counsel), for defendant John W. Watling.

*Douglas, Eaman, Barbour & Rogers,* for defendants First National Bank and First National Co.

*Keena, Lightner, Oxtoby & Hanley,* for defendant People's State Bank.

*Van Dyke & O'Brien,* for defendant William G. Lerchen and intervening defendants Post & Flagg and John G. Butterworth.

*Stellwagen & Groesbeck,* for intervening defendant Security Trust Co.

*J. O. Murfin,* for intervening defendant Jere C. Hutchins.

*Archibald H. Taylor,* for intervening defendants Julian Taylor *et al.*

MOORE, J.   From a decree in favor of the plaintiff the case is brought into this court by appeal.   The only party appealing is the Guaranty Trust Company of New York.   A motion is pending before us to dismiss this appeal for the reason that the appellant has no such interest in the litigation as to justify its appeal when all the other parties to the litigation are satisfied with the decree entered by the court below.   As the record and briefs are all before us, and the case has been ably argued orally, we have decided to dispose of it upon the merits.

The chancellor filed a carefully prepared opinion from which we quote freely:

"The bill of complaint was filed by the plaintiff in this cause against the several defendants, praying, among other things that the court separate, segregate and allocate the trust property, and the beneficiaries thereof in a certain trust mortgage dated January 1, 1902, but which in truth and fact was actually executed on the 24th day of January, A. D. 1902, by the Detroit United Railway, and which trust mortgage is designated and known as its first consolidated mortgage issued against and on all of its then existing property, both street railways in the city of Detroit and the interurban railway without the city, without distinction, discrimination or allocation, and on all after-acquired property, to the Guaranty Trust Company of New York, one of the defendants herein, as trustee to secure an issue of thirty year four and one-half per cent. gold bonds of said Detroit United Railway in the sum of $25,000,000, which said mortgage was recorded on February 3, 1902, in the office of the register of deeds for the county of Wayne.   *   *   *

"After repeated litigation between the Detroit United Railway, cross-plaintiff, maker of the trust mortgage, and the city of Detroit, the plaintiff in this cause in which the claim of the city with reference to its right in the streets and highways of the city was maintained and upheld   *   *   *   on August 2, 1921, an ordinance was adopted by the common council of the city, directing the street railway company to cease operating cars on Woodward and Fort street lines and

certain connecting streets, which said ordinance was submitted to the electors of the city of Detroit on November 8, 1921, and was duly approved by said electors by the requisite vote.

"On October 3, 1921, the Supreme Court of the State of Michigan affirmed an order of this court in a suit begun by the city against the Detroit United Railway, wherein said Supreme Court determined and decreed that the common council of the city had the right to, by proper resolution, direct the institution of suits against the said railway company, to obtain a decree of ouster against it, in respect of all tracks for which grants had by their terms expired (215 Mich. 401). * * *

"On or about March 10, 1922, after considerable negotiations had between the city of Detroit by and through its board of street railway commissioners, and the defendant railway company through its proper officers, an agreement in writing was made and entered into between the parties, in and by which agreement the city agreed to purchase, and the company to sell, at and for the price of $19,850,000 all the street railways and street railway property, including franchises and other rights, real estate located in the cities of Detroit, Hamtramck and Highland Park, and in the village of Springwells, this county, and the township of Warren in Macomb County, which said agreement was by proper resolution, adopted by the common council of the city on March 14, 1922, and submitted to the electors of said municipality for approval, on April 17, 1922, and which said ordinance was by said electors, approved. * * *

"After the approval of this latter ordinance by the people and on May 15, 1922, possession of said street railways and other property, was delivered by the railway company to the city, and the city has continued the maintenance and operation thereof from that time. At the time of taking possession, the city of Detroit paid the initial payment of $2,770,000, required by said agreement, and since that time has paid the further sum of $1,200,000, pursuant to the terms of said agreement.

"Both parties have kept all of the terms of said agreement by them to be performed, but the city is fearful that the amount of bonds still in the hands of

the public under the foregoing trust mortgage, and which aggregates considerably more than the purchase price of the urban systems, will in some manner militate against its receiving of and from the Detroit United Railway and its trustee under said consolidated mortgage, a free and clear title to the premises and file their bill seeking to separate from the trust mortgage a certain amount of the bonded indebtedness, and apply such portion as should be determined to the interurban lines of the company, and the balance to the urban lines, or the system purchased by the city of and from the railway company. It is the further claim of the city that through the final expiration of grants, including renewals and extensions in the city of Detroit, the imminence of the expiration of other such grants, the refusal of the electors of said city to approve any new grant, the determination by the court that there was no right to the company of maintenance and operation of tracks after the expiration of the grant, the determination by the electors of the city to acquire and operate a street railway system, and the ordering of the tracks out of streets, that an exigency has arisen which was not contemplated at the time of the creation of the trust mortgage by which the street railways, in the city of Detroit and the interurban railways and other property were conveyed to the Guaranty Trust Company of New York, one of the defendants, by way of mortgage, known as the first consolidated mortgage, it being the further claim of the city and likewise of the cross-plaintiff, that no such exigency had ever been contemplated, that the municipality would engage in municipal operation of street railway lines, back in 1902, when the trust mortgage was created, otherwise, if there had been any such notion or idea, it would have been taken care of in the trust mortgage, which according to the contention of both plaintiff and cross-plaintiff, there now exists no machinery in the trust mortgage for the taking care of the present unlooked for condition. The city further deems itself insufficiently protected to go on and continue its payment under the agreement of March 10, 1922, for the reason that if they pay the entire purchase price, there will still exist, on the city system, certain mortgage liens by reason of said trust mortgage, as in and by

the terms of said mortgage, both the urban and interurban lines are security for the bonds, and they pray that this court interfere, break in upon, set aside and change the terms, express and otherwise, of said instrument known as the first consolidated mortgage, creating the trust for the benefit and security of said thirty year four and one-half per cent. gold bonds, and likewise, as heretofore stated, shall separate, segregate and allocate the trust property and the beneficiaries thereof, and that the court proceed to hear this cause in respect of all persons who are or may be holders of any bonds, notes or obligations entitled to the benefit and security of any of said mortgage trusts, as a class, separated (a) as to the bonds which are to be allocated to the street railways and other property covered by said purchase agreement of March 10, 1922, between the city and the railway, and (b) as to the bonds which are to be allocated to the interurban railway, and other property retained by said railway from said agreement dated March 10, 1922, and that said defendants to this suit, as holders of any of said bonds, notes or obligations, may each be deemed to represent the entire class of holders of each of such bonds, notes and obligations, and the decree of this court may be binding on all of each of said classes, the same as if all were before the court.

"Statement of Legal Proposition Involved.

"From the foregoing statement of facts it may readily be seen that this lawsuit presents some novel propositions, new to the courts of our State. It presents several questions which are vital to a proper disposition of the case, among them: (1) Does a court of equity have jurisdiction or power under any circumstances or conditions to decree in respect of a trust, any change in the terms affecting the rights and interests of the beneficiaries? (2) Due to circumstances and conditions shown in the case at bar, does it bring the situation within the scope of such jurisdiction and power of equity? (3) Does the trust mortgage executed on January 24, 1902, contain within itself working provisions and a method to dispose of the unforeseen situation which has arisen? (4) Who are the necessary parties to a litigation of this kind, and who must be before the court in such a proceeding, that any decree made by the court will be for all

times binding and conclusive?   (5) How is the court to deal with the present situation, and if he decided that the court has power to change the provisions of said trust mortgage, what method must be pursued that will be conducive to adequately and effectively conserving and protecting the rights and interests of the bondholders?

"Conclusions of Law.

"1. Equity, Jurisdiction to Change Trust.

"'No definite rules prescribing the limits and bounds to the powers of a court of equity, in trust cases have been established. By the definition, a court of equity is clothed with a very large discretion, and it is not practicable to formulate rules for the control of a court in the exercise of this power.   But in general, it may be said, that equity has power to construe the instrument by which the trust is created, to reform the instrument in such a manner as to carry out the intention of the settlor, to instruct the trustee in regard to the execution of the trust, and to enforce the performance upon all parties concerned of the duties imposed by the instrument.   There are circumstances under which a court of equity may act in opposition to the provisions of the trust.   It may do whatever is necessary for the preservation of the trust property, and in general, whatever is necessary, for the protection of the rights of the beneficiaries, and for the promotion of their interests.'   2 Beach on Trusts & Trustees, § 758, p. 1742.

"The leading case on this subject, one of the earliest decided and the most fully and well reasoned is *Curtiss* v. *Brown*, 29 Ill. 201.   A trust has been created by deed in 1843, for a married woman to continue during the joint lives of her husband and herself and providing for the vesting or disposition of the remainder. The trust was 'to pay the rent, issues and profits to (her) * * * for her sole and separate use' but without power of anticipation and 'so that in no event whatever shall (her husband) have or exercise any authority, power, right or estate in said premises.' The property became of great value but unproductive. A bill was filed by husband and wife to have the property decreed to be sold.   Such a decree was made and the property was sold.   The decree permitted the proceeds to be turned over to the wife.   The money having been 'lost or gone' through 'her own folly and the improvidence or * * * misfortune of her hus-

band,' the decree was attacked as made without juris-
diction, the court stating:

" 'The most important question presented, and that which is
ultimately to have a controlling influence on the rights of these
parties, is, Had the court of chancery jurisdiction or power to
entertain the first bill, and to render the decree? * * *

" 'The case might exist where the property was unproductive,
as in this case, but where the *cestui que trust* was absolutely
perishing from want, or forced to the poor house, or where the
trustee could not possibly raise the means to pay the taxes upon
the property, and thus save it from a public sale and a total
loss. Can it be said that the beneficiary of an estate which
would bring in the market one hundred thousand dollars, should
perish in the street from want, or be sent to the poor house
for support or that the estate should be totally lost, because there
is no power in the courts to relieve against the provisions of
the instrument creating this trust? Exigencies often arise,
not contemplated by the parties creating the trust, and which,
had they been anticipated, would undoubtedly have been pro-
vided for, where the aid of the court of chancery must be in-
voked to grant relief imperatively required; and in such cases
the court must, as far as may be, occupy the place of the parties
creating the trust, and do with the funds what he would have
dictated had he anticipated the emergency. In *Harvey* v.
*Harvey*, 2 P. Wms. 21, the court said it "would do what in
common presumption the father, if living would, nay, ought to
have done, which was to provide necessaries for his children."
It is true that courts should be exceedingly cautious when inter-
fering with, or changing in any way the settlements of trust
estates, and especially in seeing that such estates are not
squandered and lost. Trust estates are particularly under the
charge of and within the jurisdiction of the court of
chancery. * * *

" 'If then the courts have not the power, in this country it
nowhere exists, and there must be a failure of justice, possibly
in the most extreme case of necessity. All who are familiar
with the history and growth of the court of chancery in England,
know that its jurisdiction has found its root in necessity. It
has ever been its boast that it was its peculiar province to afford
relief in cases of necessity, where the other tribunals lacked
the power to do justice, or afford the necessary relief in the
particular case; and it is by no means certain that the court
of chancery would not have exercised the power and granted the
relief in these cases, had it not seen, that sufficient power

existed in another tribunal where complete justice could be done. * * *

" 'We have nowhere found this subject carefully examined, as a distinct subject of chancery jurisdiction, and the limit of this power clearly settled. All the cases we have met with on the subject are very short, and none of them attempt to discuss the subject upon principle, and we are left to deduce a principle from the isolated questions decided; but from them, we have no hesitation or difficulty in arriving at the conclusion that this decree was rendered in the exercise of a legitimate jurisdiction, and not of an usurped power. The bill showed that the trust deed was executed in consideration of the relinquishment of dower by Mrs. Curtiss, which she held in other lands. That the estate thus held in trust for her, was of great value, but was unproductive; and prayed that the property might be sold, and the proceeds vested in such a way as to make it productive. This bill presented such a case as to require the court to investigate, to deliberate and to decide, whether it was for the best interests of the *cestui que trust* to grant this her prayer. This, we think, cannot be denied, and indeed many judicious persons might think it better to order a sale and reinvestment on such state of facts. The bill at least was sufficient to give the court jurisdiction, and when that is once established the decree at.least is not void for the want of power.'

"Again, in the case of *Dodge* v. *Cole*, 97 Ill. 338 (37 Am. Rep. 111), the court said:

" 'The jurisdiction of a court of equity does not depend upon the mere accident whether the court has, in some previous case or at some distant period of time, granted relief under similar circumstances, but rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people. * * * Where it is clear the circumstances of the case in hand, require an application of those principles, the fact that no precedent can be found in which relief has been granted under a similar state of facts, is no reason for refusing it.'

"Again, in the case of *Johns* v. *Montgomery*, 265 Ill. 21 (106 N. E. 497, L. R. A. 1916B, 1073, Ann. Cas. 1916A, 996), the court states:

" 'In regard to the jurisdiction of courts of chancery to direct

the conversion of real estate into personal property, and *vice versa*, and to decree other modifications of trust agreements when it becomes necessary to preserve the trust estate, it may be stated as a general proposition, that while the power is exercised with great caution it has become a well established rule that when the court can see that unforeseen conditions had arisen which makes it necessary, to preserve the right of beneficiaries under trust instruments, to change the terms of the trust, courts of equity have not hesitated to direct such necessary modifications as will preserve the trust estate for the use of the beneficiaries. The power of a court of chancery to thus modify the terms of trust instruments, is sustained in this State by the following authorities;' citing, *Curtiss* v. *Brown, supra,* and a long line of other Illinois cases.

"See, also, *Packard* v. *Savings Bank,* 261 Ill. 450 (104 N. E. 275) ; *Bennett* v. *Nashville Trust Co.,* 127 Tenn. 126 (153 S. W. 840, 46 L. R. A. [N. S.]' 43) ; *Mann* v. *Mann,* 122 Me. 468 (120 Atl. 541) ; *Colorado, etc., R. Co.* v. *Blair,* 214 N. Y. 497 (108 N. E. 840, Ann. Cas. 1916D, 1177).

"2. From the foregoing citation of authorities I am of the opinion that a court of equity has not only the jurisdiction, but the power as well, to entertain both the bill of complaint and the cross-bill of complaint and to grant the relief prayed for.

"3. Do the circumstances and conditions shown in the case at bar bring the trust situation within the scope of such jurisdiction and power of equity? It is the contention of both the plaintiff and cross-plaintiff that such an exigency has arisen which was never contemplated by the parties to the trust mortgage when it was executed, and it is of such an unusual nature that it deserves all of the consideration a court of equity can give to it, and that equity should grant relief in the premises. On the other hand it is the contention of the Guaranty Trust Company, defendant and trustee under the first consolidated trust mortgage, that no such exigency exists as cannot be taken care of under the terms of the trust mortgage, and further, that it is not such an exigency as warrants the invoking of the aid of a court of equity. It is further the contention of counsel for the Guaranty Trust Company that the exigency did exist prior to the signing of the agreement of March 10, 1922, by

and between the city and the railway company, but
that immediately upon the execution of that agreement,
at that moment, the said exigency ceased to exist, and
that the bondholders were secured to the extent of
$19,850,000, the payment to be made by the city to
the railway company, and that under the trust mort-
gage, they can release to the city free and clear of all
liens and especially of the liens created by the trust
mortgage, the property in question.   I feel con-
strained, however to disagree with the contention of
the defendant trustee, because I think it cannot be
gainsaid that an exigency did arise wherein and where-
by the bondholders who had purchased their bonds of
the trustee, on the faith and security of the city lines,
were about to lose their entire security, and would
have to look to the interurban lines which, as the
proofs disclose, could never, standing alone, carry said
bond issue of $25,000,000.   The court by reason of
location, must take into consideration by way of
judicial knowledge, the conditions that exist in the
city of Detroit, affecting the citizens of the munici-
pality and the defendant railway company, and from
a knowledge of those conditions, must state it as a
fact, and I think I am amply borne out by the proofs
in this respect, that the railway company was of
necessity obliged to accept the terms of the city, and
under existing conditions were indeed fortunate to
have received the sum of $19,850,000 for the property,
that as I recall, was appraised at around $43,000,000.
I am therefore of the impression that an exigency did
and does exist, that requires the aid and assistance of
a court of chancery in respect of allocating and segre-
gating the bond issue to the respective parties.   I am
likewise of the opinion that the mortgage does not,
in and of itself, contain the necessary provisions or
working machinery, to carry out the terms of the
agreement between the railway and the city, whereby
the city is to receive a clear title, free of all liens,
because the provision contained in the trust mortgage
states among other things,

"'until default  *  *  *  the railway company shall  *  *  *  be
suffered and permitted at all times, and from time to time to
sell, exchange, remove or replace any materials, supplies, rolling
stock, stores, machinery, tools and implements hereby conveyed,

assigned and mortgaged, or herein expressed, or intended so to do which shall no longer be either useful or necessary in the proper and judicious management of the business and interests of the railway company, or to alter or repair any such rolling stock, machinery, tools or implements; and the railway company shall have the further right at all times and from time to time, to sell and convey, free from the lien of these presents, any of its real estate, buildings and fixtures which shall no longer be useful or necessary in the proper and judicious management of the business and interests of the railway company.'

"From the reading of the foregoing, I do not think that it can be safely said that this contemplates anything but a sale of a portion or parcel of property of the railway company, and does under no circumstances attempt to convey the meaning that it refers to a sale of the entire city system, as a going concern, to a purchaser who continues to operate said system as a whole. And further, I do not believe it was ever within the contemplation of the parties, or within the intendment of the mortgage that the entire urban lines, being practically the principal property, on the security of which the bonds were sold, might be sold, and the 'net cash proceeds   *   *   *   (applied) toward the acquisition of additional real estate, fixtures or equipment.'

"It occurs to me that giving this clause careful perusal it contemplates that for all property or premises disposed of by the railway company, new material or properties of like value, should be purchased, thereby at all times keeping the property up to the mortgage requirements.

"4. Necessary parties—Who are they? Are they before the court?

"It is a well known fact that to every trust there are three parties; the creator, the trustee and the beneficiaries, and in the case at bar, in addition to the foregoing parties there is the fourth party, the municipality, which was not a party to the trust mortgage at the time of the execution of same. It likewise appears to be the law, that in the absence of an express agreement contained in the mortgage, that the trustee does not, and cannot represent the bondholders, or any such holders as are involved in this litigation. This seems to be the principle as laid

down in the case of *Colorado, etc., R. Co.* v. *Blair, supra.*

"In the case at bar, some of the bondholders of every class, are represented before the court, either in person or by attorney, and some bondholders who were not originally parties to the suit intervened and placed their matters in the care and keeping of the court.

"It might be well at this point to call attention to the fact that everybody who was questioned with reference to the advisability of permitting allocation, as prayed for in the bill of complaint spoke heartily in favor of it, even the trust company by its Mr. Sutton, who declared that, acting in an individual capacity, he would recommend and indorse the proposition, but as a trust company, and having in mind at all times the safeguarding of the interests of the bondholders, that he could not consent to the relief prayed for.    This may be made more apparent by the following question and answer:

"'*Q*. Didn't you say, in answer to one of Mr. Van Dyke's questions, that if you were an individual bondholder, instead of a trust officer, that you would like to see this allocation go through, as a good thing?    Didn't you?

"'*A*. Yes, I think I would, because I believe the city will pay off those bonds.'

"It seems to be a well known equitable doctrine that virtual representation clearly establishes the rule that where it would be totally impracticable to bring all the members of a definite class before the court, where they may have an opportunity of appearing, if they elect so to do, but where certain of their class are before the court, and the proposed decree is beneficial, that all parties are bound by the action of the court. It was this question that presented itself to the court at the very outset of this hearing, whether or not, in the absence of all bondholders being made parties to this litigation, any decree made by the court would be binding upon the absent parties, and while there does not seem to be any case in point, there are plenty of decisions bearing upon and involving the effect of class suits to such an extent in fact that there has arisen, and is known in the law, a rule of class representatives to a suit.    This latter class of litiga-

tion, in the main, applies to fraternal insurance organizations, but there are other cases as was stated in *Leviness* v. *Electric Light Co.*, 114 Md. 559 (80 Atl. 304, Ann. Cas. 1913C, 649).

"While the general rule undoubtedly requires that all persons interested must be made parties to any proceeding by which they may be affected, yet to this rule there are well recognized exceptions, founded upon considerations of practical convenience, and adopted to avoid a denial of justice.    These exceptions are thus stated in Story's Equity Pleadings (10th Ed.), § 97:

" '(1) Where the question is one of a common or general interest and one or more sue or defend for the benefit of the whole.    (2) Where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interests of the whole.    (3) Where the parties are very numerous and though they have or may have had separate and distinct interests, yet it is impracticable to bring them all before the court.'

"In discussing the exceptions, the learned author says (§§ 96, 120):

" 'It has been well observed that the general rule, being established for the convenient administration of justice, ought not to be adhered to in cases in which, consistently with practical convenience, it is incapable of application; for then it would destroy the very purpose for which it was established.    The exceptions, therefore, turn upon the same principle, upon which the rule is founded.    They are resolvable into this, either that the court must wholly deny the plaintiff the equitable relief, to which he is entitled, or that the relief must be granted without making other persons parties.

" 'It is obvious, that under such circumstances, the interests of persons, not actual parties to the suit, may be in some manner affected by the decree; but the suit is nevertheless permitted to proceed without them, in order to prevent a total failure of justice.    Indeed, in most, if not in all, cases of this sort, the decree obtained upon such a bill will ordinarily be held binding upon all other persons standing in the same predicament, the court taking care that sufficient persons are before it, honestly, fairly, and fully, to ascertain and try the general right in contest.'

"See, also, *McClelland* v. *Rose*, 247 Fed. 721 (Ann. Cas. 1918C, p. 341).

"It occurs to the court, that in view of the existing conditions, that no absent party can be harmed in any respect by the decree of the court; in fact, it is the court's impression that they will be benefited materially and, further, that if the city had proceeded in its advertised program, the major portion of the security for the bondholders would have been wiped out in fact, by being obliged to tear up tracks, restore pavements, tear down wires, poles and other equipment, a considerable portion of money would necessarily have to be either raised, or used from the reserve, by the company, to properly dispose of the order of the municipality in this respect, thereby increasing the loss.

"This question was passed upon in the case of the *Colorado, etc., R. Co.* v. *Blair, supra,* wherein the court among other things, stated:

" 'The fact that the bondholders are numerous and unknown is thought to present a reason for allowing the trustee to represent them, and there are *dicta* which seem to support that view, but in truth the reason why the courts proceed in such cases, in the absence of some whose rights may be directly affected, is one of necessity and does not rest on the true doctrine of representation;' citing *Powell* v. *Wright,* 7 Beav. 444; *Kent* v. *Church of St. Michael,* 136 N. Y. 10 (32 N. E. 704, 18 L. R. A. 331, 32 Am. St. Rep. 693).

"The bondholders themselves have a right to be heard in such a suit and no one not authorized to do so, can represent them.   If some of them enough to satisfy the court that the interests of all are protected, are made parties, the presence of all may be dispensed with, under the rule of necessity above stated.   *   *   *   It needs to be better understood that judgments only bind the parties and their privies, and that when it is sought to bind persons not made parties individually, that fact and the necessity, should be made plain to hand, that the court may determine whether sufficient parties are before it, and may take proper care of the rights of the absent.

"There are in round numbers, 1,200 bondholders scattered throughout the world, and the bonds are negotiable by delivery constantly traded in; the bondholders are continually changing; it therefore can

226—Mich.—24.

readily be seen that it is almost impossible for all of the parties to be present in court to take care of their interests in this case.      As was stated in Fletcher, Equity Pleading & Practice, § 28:

" 'Another class of cases constituting an exception to the general rule as to parties is where the parties are very numerous, and, although they have or may have separate and distinct interests, yet it is impracticable to bring them all before the court, and on this account they are dispensed with.   In this class of cases there is usually a privity of interest between the parties, but such privity is not the foundation of the exception.   In all of these cases, however, there always exists a common interest or common right which the bill seeks to establish and enforce, or a general claim of privilege which it seeks to establish, or to narrow, or take away.   Under such circumstances, the interests of persons not actual parties to the suit, may be in some measure affected by the decree, but the suit is nevertheless permitted to proceed without them, in order to prevent a total failure of justice.   In most, if not in all, cases of this sort, the decree obtained upon such a bill will ordinarily be held binding upon all other persons standing in the same predicament, the court taking care that sufficient persons are before it honestly, fairly and fully to ascertain and try the general right in contest.  *  *  *  In this class of cases all the parties stand, or are supposed to stand, in the same situation, and have one common right or one common interest, the operation and protection of which will be for the common benefit of all, and cannot be to the injury of any.   Therefore, the bill is permitted to be filed by a few on behalf of themselves and all others, or against a few, and yet to bind the rights and interests of the others.'

"Also, *Hale* v. *Hale,* 146 Ill. 227 (33 N. E. 858, 20 L. R. A. 247).

"As was stated in Calvert on Parties to Suits in Equity, p. 19, where in discussing the doctrine of representation as an exception to the general rule, requiring all persons in interest to be made parties, it is said:

" 'It is a rule founded upon the advantage which all persons interested will derive from the completeness of the decree, and from the entire settlement of the matter in litigation—in other words it is founded upon convenience; and the same principle guides our courts of equity in the mode of putting the rule into

operation, as they never allow it to produce any inconvenience which can safely be avoided.    With this view, they have adopted the principle of representation.'

"See, also, *Davis* v. *Peabody*, 170 Mass. 397 (49 N. E. 750) ; *United States* v. *Old Settlers*, 148 U. S. 427 (13 Sup. Ct. 650).

"In the case of *Supreme Tribe of Ben Hur* v. *Cauble*, 255 U. S. 356 (41 Sup. Ct. 338), the court states:

" 'Class suits have long been recognized in Federal juris: prudence.    In the leading case of *Smith* v. *Swormstedt*, 16 How. (U. S.) 288, 303, of such suits this court said:    "Where the parties interested in the suit are numerous, their rights and liabilities are so subject to change and fluctuation by death or otherwise, that it would not be possible without very great inconvenience, to make all of them parties and would oftentimes prevent the prosecution of a suit to a hearing.    For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court." '

"The court, referring to the Federal equity rule relating to class suits, said:

" 'Class suits were known before the adoption of our judicial system, and were in use in English chancery.'

"In the case of *Hartford Life Ins. Co.* v. *Ibs*, 237 U. S. 662 (35 Sup. Ct. 692, L. R. A. 1916A, 765). This was a suit that had been brought in Connecticut by 31 members out of 12,000 attacking a change of plan of insurance and the number and amount of assessments being levied.    The position of the company was finally upheld.    [*Dresser* v. *Insurance Co.*], 80 Conn. 681 (70 Atl. 39).    Afterwards, Ibs, who was a resident of Minnesota and not a party to the Connecticut suit, unless by representation, died, and suit was brought by the beneficiary in Minnesota. The Minnesota court declined to recognize the Connecticut judgment.    The United States Supreme Court held the Connecticut judgment binding, saying:

" 'It was impossible for the company to bring a suit against 12,000 members living in different parts of the United States. It was equally impossible for the 12,000 members to bring a suit against the company to determine the questions involved.

Under these circumstances Dresser and thirty other members holding certificates, brought suit in their own behalf and in behalf of all others similarly situated.

" 'That allegation, of course, would not by itself determine the character of the proceeding (*Wabash R. Co.* v. *Adelbert College*, 208 U. S. 58 [28 Sup. Ct. 182]). For, in order that the decree should be binding upon those certificate holders who were not actually parties to the proceeding, it had to appear that Dresser and the other complainants had an interest that was, in fact, similar to that of the other members of the class, and that it was impracticable for all concerned to be made parties. But, when such common interest in fact did exist, it was proper that a class suit should be brought in a court of the State where the company was chartered and where the mortuary fund was kept. The decree in such a suit, brought by the company against some members, as representatives of all, or brought against the company by thirty certificate holders for the benefit of themselves and all others similarly situated, would be binding upon all other certificate holders.'

"It must necessarily be seen from the foregoing, that there are in fact enough of the bondholders of a class, before the court to give it jurisdiction over the absentees, and in making a decree, to completely and effectually bind their interests.

"Finally the relief to be granted—

"Being of the opinion that an exigency exists requiring the aid of a court of chancery, in remedying an unforeseen situation, and likewise that the court has power and jurisdiction, and also that the necessary parties are before the court to effectually dispose of the matters in issue, I am constrained to hold that an allocation and segregation of the bonded indebtedness should be made.

"I have heretofore informed the counsel that, upon the arrival at my determination in the matter, I would request their attendance upon the court with reference to putting in the form of the decree the necessary conditions to fairly, justly and equitably allocate and aggregate the bonded indebtedness.

"I have perused carefully the proposed decree appended to cross-plaintiff railway company's brief, and with one or two minor changes, I am frank to say the same appeals to me: However, I shall be pleased to hear from all counsel with reference to a proper decree to be entered in this cause.

"I am of the impression that counsel, noting the foregoing opinion, will readily agree upon the form of decree, and there will be no disturbance over this particular phase of the litigation.

"The question being a novel and important one to all of the parties concerned, it follows that no costs will be awarded to any of the parties."

Counsel were heard as to the form of the decree, and one was entered in accordance with the opinion. The decree is necessarily very long, and we do not deem it necessary to recite it at length, but quote from it as follows:

"*Seventh:* The court reserves jurisdiction on application of any party to the cause or other party in interest, in the event the plan or method of relief in subdivision second hereof provided shall be found impracticable of accomplishment, to make such modification or change therein or other or further order as may seem to be requisite to the due protection and preservation of the trust estate and the rights and interests of the parties, particularly bondholders, as beneficiaries of said mortgage trust.   And it is further ordered that this cause shall be retained and held open for the further action, proceeding and decree of the court upon the application of any person or party having an interest in the subject-matter of this suit so as always to effectively enforce the execution of this decree and any and all terms thereof for the benefit of the parties entitled to such execution.

"And it is further ordered that this cause shall be retained and held open for the further action, proceeding and decree of the court upon the application of any person or party having an interest in the subject-matter of this suit so as always to effectively enforce the execution of this decree and any and all terms thereof for the benefit of the parties entitled to such execution."

The appellant makes the same claims in this court that it made in the court below, and which are sufficiently stated in the opinion of the chancellor which we have quoted.

There remains little to be added to what was so well said by the chancellor. The authorities he cited justify his conclusion of law. See *Marsh* v. *Reed,* 184 Ill. 263 (56 N. E. 306) ; *Pennington* v. *Metropolitan Museum of Art,* 65 N. J. Eq. 11 (55 Atl. 468).

The record discloses that all classes of the bond-holders to be affected by the decree were well represented before the court. The testimony indicates very clearly that all of them are abundantly secured by the decree as made, and their respective rights are carefully safeguarded.

The decree is affirmed, but without costs to either party.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, and STEERE, JJ., concurred. FELLOWS and WIEST, JJ., concurred in the result.